<hr />

## THE BELLE.[1]

## THE NORWICH.

### CLARK v. THE BELLE AND THE NORWICH.

*(District Court, S. D. New York. March 24, 1888.)*

COLLISION—BETWEEN TOWS—NARROW CHANNEL—UPPER HUDSON NAVIGATION.
  A collision occurred at night in the upper Hudson, a little below Four-Mile Point, some 30 miles below Albany, where a shoal divides the river into two channels, the westerly channel being ordinarily used by tows. At the lower end, where the channels meet, the ebb-tide, coming out of the easterly channel, causes the current to set towards the west shore. The steam-boat B. and her tow were approaching the entrance to the west channel, going up stream, and were moving so slowly that the set of the ebb-tide towards the west shore swung the tail of her tow somewhat to the westward. The steam-boat N. and her tow came down the west channel, passing within 50 to 75 feet of the B., and the N. collided with libelant's canal-boat, on the port side of the end of the B.'s tow. Both steam-boats saw and signaled to each other at a consider-

<hr />

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

able distance. *Held,* that the B., perceiving the descending flotilla, was in fault for occupying with her bending tow any portion of the western side of the narrow channel. *Held,* that the N., knowing the westward set of the current, and the consequent probable swing of the B.'s tow to the west, was in fault for attempting to pass so near to the B., such approach not being absolutely necessary. Both steam-boats were therefore held in fault.

In Admiralty. Libel for damages.

*Hyland Zabriskie,* for libelant.

*Owen & Gray,* for the Belle.

*R. D. Benedict,* for the Norwich.

BROWN, J. At about 1 o'clock A. M. of the night of August 14, 1887, while the libelant's canal-boat Governor Dix was proceeding up the North river with a fleet of canal-boats in tow of the steam-tug Belle, and being the outer boat on the port side in the third tier from the end of the tow, she was run into by the steamer Norwich, which was coming down the river, and received damages for which this suit was brought. The libelant's boat was without fault. The litigation is between the Belle and Norwich. The collision was about 30 miles below Albany, a little above Four-Mile Point, on the western shore. About 1,500 feet above the light-house, which is situated on the point, is a buoy, placed at the lower end of the flats known as the "Middle Ground," which divides the river into two channels, called the easterly and westerly channels. The deeper and the better water is in the westerly channel, which is the one generally used by tows. Immediately above the point the west channel and shore bend somewhat to the westward, and the ebb-tide from the easterly channel causes the current to set somewhat towards the point and the shore for several hundred yards to the southward. This naturally inclines the ends of tows somewhat towards the westerly shore, unless sufficient precautions are taken against it. Owing to this westerly set of the ebb-tide, and the narrowness of the entrance to the westerly channel, it is unsafe for tugs with tows to meet and attempt to pass each other at the southerly entrance of the westerly channel. The usage, when they are likely to meet at that place on the ebb-tide, is for the up-going tug either to wait at a little distance below the point, or keep so far to the eastward below the buoy as not to interfere with the down-coming tug and tow, which on the ebb have the right of way. The evidence shows that the Belle and Norwich saw and whistled to each other at abundant distance; that the Belle was proceeding quite slowly, but did not stop before passing the point, making about a mile an hour by land, (while her fires were being raked out,) but continued on till she was within 100 or 200 feet of the buoy, where the Norwich passed her; and that she kept on without stopping at all, not at the time knowing of the collision.

The weight of the evidence is to the effect that the Belle's tow was swung considerably to the westward, as it would naturally be from the effects of the current while the Belle was running so slowly; and that the Norwich, which passed the Belle some 50 to 75 feet off, ran into the end of the Belle's tow in consequence of its swing to the westward, instead of keeping in a straight line astern. The witnesses of the Belle were not in a

position to see the situation of the tow as well as the other witnesses; and the master in fact said that he could not distinguish its exact position. From the Brewer Company's dock upwards for some 2,300 feet to the buoy the tow had been subject to the westward set of the tide, such as it was, more or less, during a period of from 20 to 25 minutes. The whole length of the tug and tow was about 1,200 feet, and at the very slow speed of a mile an hour, some effect from the westward set of the current was unavoidable. This accords with the westward bend of the tail of the tow as testified to by the Norwich's witnesses. Captain Oliver of the Belle, though a man of large experience, did not remember to have met a descending tow before at that point while going at so slow a rate of speed. Some of the witnesses for the Belle testify to her coming up to a point either directly south of the buoy, or a little to the eastward of it. The pilot of the Pontiac, the helper of the Belle, and on her port side, says that when the Norwich passed the buoy, she was about 200 feet above the Belle, a little on her starboard bow; and that they usually go about 150 or 200 feet away from the buoy in going up on the ebb-tide. This testimony, together with the fact that the Belle did not stop in her course, and the extreme difficulty of passing the buoy with a tow, if she had come up directly south of it, within the space of 100 or 200 feet, as her witnesses stated, lead me to the conclusion that she was not all to the eastward of the line of the buoy, but probably a little to the westward of it. In this position, with so slow a speed, and her tow swinging more or less to the westward, I do not think the navigation of the Belle can be justified as safe or prudent, having respect to descending tows in the night-time in that narrow channel. There was nothing to prevent her stopping either below the Brewer's Company's dock, or considerably further to the eastward, in mid-river, before reaching the buoy. Knowing that the tug and tow were coming down, she was bound to give them plenty of room, where, as in this case, there was nothing to prevent her doing so. Considering the heavy losses that are often sustained from collisions through the calculation of narrow chances, no rule should be upheld by the court that does not enforce the obligations of prudent and safe navigation, as between different alternatives. I feel bound, therefore, in the interest of safe navigation, to hold, considering the needs of a descending tow in the night-time in that narrow passage, and the liability of the descending tow to swing somewhat to the westward while passing Four-Mile Point, that the Belle should be held to blame for occupying with her bending tow any portion of what properly belongs to that channel.

In the case of *Lartan* v. *The Conqueror*, Mar. Reg. July 28, 1886, which was a case of collision very near the same point, the descending tow was held liable because she did not keep to the westward side of the channel; the ascending boat, the Conqueror, having grounded upon the middle ground. The tide in that case appears to have been the first of the ebb, but no mention was made of its westward set. That, doubtless, has an important bearing upon the proper course of the descending tug in reference to the management of her tow. The chart of the region, how-

ever, shows that the trend of the westerly shore to the westward above Four-Mile Point is but slight, and the bend at the point is a very gentle one. It cannot be absolutely necessary, therefore, for a descending tug to occupy the whole channel-way, and from the evidence in the cause it would appear that different pilots of equal experience differ somewhat in their customary course in coming down. The usual course of the Norwich was to draw gradually to the eastward for some time before reaching the buoy. That she did so in this case, so as to pass very near the buoy, is shown by the fact that she passed within 50 feet of the Belle. I cannot find, upon the evidence and an inspection of the chart, that so easterly a course was necessary. Having seen the Belle with her tow long before, and knowing that the Belle, instead of stopping, was continuing her approach with her tow, and seeing their positions as they drew near each other, I think the Norwich was bound not to go so far to eastward, nor so near to the Belle and her tow, as she did. As the ebb-tide sets somewhat to the westward, she was bound to know that the tail of the Belle's tow must be swinging somewhat to the westward of the Belle, so as to render so near an approach to the Belle dangerous to the tow below. This near approach not being absolutely necessary, as I must hold, to her own safety, was therefore imprudent, and unjustifiable.

There is reference in the testimony to a part of the Norwich's tow rubbing some boats at the docks on the western shore; but it also appears that one of the boats in her tow, there being only four abreast, rubbed along the leeward tier of the Belle's tow. As this must have been but a little only to the westward of the line of the buoy, I am inclined to think that the rubbing of some of the boats along the dock on the western side took place afterwards, and as the result of some disarrangement of her tow after the Norwich had stopped. The circumstances are so obscurely stated that I cannot give this evidence any controlling weight. Had the Norwich approached more slowly towards the Belle, whose dangerous position she saw; had she gone, as she might have gone, further to the westward, I think her own tow would have come down safely and straight in a line with the current; and that she would have passed safely and without collision, astern of the tow of the Belle.

No further reference as to damages being desired, the damages are found to be $367.68, with interest from September 22d. This includes demurrage for nine days at the rate of $10 per day; which is a reasonable amount for the detention of the boat with the several men and horses attached. For that sum, with interest and costs, the libelant is entitled to a decree against both vessels in the usual form.